IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| v. | § | Criminal No. **3:18-CR-345-L** |
| | § | |
| **ANDREW KASNETZ** | § | **Filed Under Seal** |

## MEMORANDUM OPINION AND ORDER

Before the court is the Motion to Quash filed by the University of Massachusetts Amherst, by and through its College of Information and Computer Sciences, together with its faculty members Brian Levine and Marc Liberatore (collectively, "UMASS") (Doc. 228), filed November 30, 2022.  UMASS seeks to quash the three document subpoenas served by Defendant Andrew Kasnetz on November 18, 2022, which required them to produce the document requested by  5 p.m.  on November 30, 2022.  Because of the timing of the subpoenas and scope of the materials sought, the court stayed UMASS's deadline to produce the materials demanded pending resolution of its Motion to Quash. On December 6, 2022, Defendant Kasnetz filed his response in opposition to the Motion to Quash. If the Motion to Quash is granted, Defendant requests that the Government be prohibited from presenting any evidence at trial regarding the Torrential Downpour software used by law enforcement in this case to perform its investigation and obtain a search warrant of his residence and electronic devices. Also before the court is Defendant's oral motion made on December 7, 2022, to allow an undisclosed Rule 702 expert to testify as a rebuttal witness in the trial of this case that commenced on December 6, 2022.

After considering the Motion to Quash, Defendant's response, the record, and applicable law, the court **grants** the Motion to Quash (Doc. 228) and **quashes** the three subpoenas served by Defendant on UMASS.  For the reasons herein explained, the court also: (1) **denies** Defendant's

oral motion to allow Rohan Mishra to testify as a Rule 702 witness; and (2) **denies** Defendant's request to preclude the Government from presenting any evidence in the trial of this case regarding law enforcement's use of Torrential Downpour.

## I.   Factual and Procedural Background

### A.   Law Enforcement's Investigation

Starting in October 2017, law enforcement conducted an online investigation concerning the sharing of child pornography on BitTorrent, a peer-to-peer file sharing software program that allows users to search for, download, and share information with other users on the BitTorrent network.  During the investigation, law enforcement used Torrential Downpour software that was specifically developed for use by law enforcement to investigate the online distribution of child pornography through BitTorrent software file sharing.  Through the use of Torrential Downpour to search publicly available BitTorrent network file indices, law enforcement identified an IP or internet protocol address that was associated with a torrent file that referenced files containing content believed to be child pornography. Law enforcement used the Torrential Downpour software to establish a direct connection with an electronic device at the same IP address and downloaded files associated with the torrent file.

Over the period of a month, law enforcement used this same procedure to download hundreds of files from the same IP address. Through the use of an administrative subpoena that described the file contents shared by the device at the IP address, law enforcement requested subscriber information from internet provider Charter Communications for the account associated with the IP address. Charter Communications identified Defendant Kasnetz as the account holder of the IP address, which was associated with his home address and residence.

**B.      Search of Defendant's Residence and Computers**

Based on this information, law enforcement obtained a search warrant on February 20, 2018, to search Defendant Kasnetz's residence and seize information and electronic devices that would tend to establish that: (1) such device or devices were used to search, solicit, access, display, possess, or distribute child pornography; and (2) identify the persons who used, controlled, or owned the devices.  The warrant also authorized the removal of seized electronic devices from Defendant's residence for purposes of conducting a scientific forensic analysis of such devices at another location.

**C.      Indictments Charging Defendant with Possessing and Receiving Child Pornography**

On July 11, 2018, Defendant Kasnetz was charged in a two-count Indictment of possessing and receiving child pornography, which was superseded on September 22, 2020 (Doc. 81).  Count One of the Superseding Indictment charges Defendant Kasnetz with receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2) and alleges that he downloaded a video file containing child pornography on February 20, 2018, the date the search of his residence was conducted. Count One further alleges that the video file depicts a minor child's mouth being penetrated by a penis, and the penis ejaculating into the child's mouth. Counts Two and Three of the Superseding Indictment charge Defendant Kasnetz with possessing material containing child pornography that depicts prepubescent minors in violation of 18 U.S.C. § 2252A(a)(5)(B). Counts Two and Three both charge Defendant with possessing an HP Envy desktop computer and a Samsung laptop computer containing child pornography on February 20, 2018. Both counts allege that the files include detailed descriptions of minors engaged in sexually explicit conduct.

**D.      Revolving Door of Defense Attorneys and Related Case Delays**

Defendant is currently represented by four retained attorneys. One of those attorneys is Scott Palmer, who substituted in as Defendant's lead counsel in September 2022.  During the course of this case, which has been pending now for more than four years, Defendant Kasnetz has had a total of eleven retained attorneys represent him, and many of the delays in this case are attributable to Defendant's inability to get along with his chosen attorneys, as well as the various medical procedures and surgeries that he represented were urgent and necessary.  One of Defendant's retained attorneys, Jeffrey Hall, was also subsequently appointed as counsel under the Criminal Justice Act based on Defendant's request for appointment of counsel and his alleged financial inability to continue paying Mr. Hall for his services.

**E.      Motions to Suppress Evidence**

On October 22, 2021, Mr. Hall filed two motions to suppress evidence obtained by law enforcement as a result of the search conducted of his residence on February 20, 2018.[1]  In these motions, Defendant focused on the alleged unlawfulness of the pre-warrant investigation by law enforcement.  In addition, he argued that the forensic analysis of the computers seized from his residence, which occurred after the computers were removed from his residence, exceeded the scope of the warrant because the warrant only authorized the search and analysis of electronic devices *at the residence*.  Defendant's motion as to this latter argument was without merit and denied on March 22, 2022, as the warrant plainly allowed off-site review of the electronic devices. Doc. 172.

---

[1] The motions to suppress filed by Mr. Hall were similar to those that were previously filed in June 2021 by Defendant's former counsel Conner Nash and later denied without prejudice by the court after Mr. Nash was allowed to withdraw as Defendant's counsel.

**Memorandum Opinion and Order – Page 4**

The court also denied Defendant's motion to suppress to the extent it was based on law enforcement's pre-warrant investigation. Doc. 172.  Defendant argued that law enforcement's use of BitTorrent and Torrential Downpour software—before the warrant was obtained to search his residence and computers—to access and invade his privacy by "tagging" his computer or installing "malware" on these devices without a warrant constituted an unlawful search in violation of the Fourth Amendment to the United States Constitution.  He, therefore, contended that "all fruits of the [pre-investigation] warrantless search should be suppressed."  Doc. 144 at 4-5.

The court denied Defendant's motion to suppress on this ground because the Government provided evidence establishing that the BitTorrent software alleged to have been used by Defendant Kasnetz to download child pornography is a peer-to-peer network software that makes IP addresses, images, and other information *publicly available* to other BitTorrent users.  The Government's evidence further established that only *publicly available* information was accessed during law enforcement's investigative efforts, and it was this information that was used by law enforcement to obtain a warrant to search his residence and computers. Defendant Kasnetz, on the other hand, presented no factual allegations or evidence to the contrary.  While he contended, *based on information and belief*, that law enforcement placed malware on his computer, no facts were alleged in his motion to support this conclusory assertion.  Moreover, the Government had provided evidence that neither BitTorrent nor Torrential Downpour had the capability to use or install malware, tags, or globally unique identifiers ("GUID"). The court, therefore, determined that Defendant failed to establish a Fourth Amendment violation.

### F.    Motion to Compel Torrential Downpour Software and Source Code

After Defendant Kasnetz filed his motions to suppress, but before the court ruled on the motions, on December 3, 2021, his attorney Mr. Hall also filed various discovery motions (Docs.

153-56), including a motion to compel pursuant to Federal Rule of Criminal Procedure 16(a)(1)(E).[2] Doc. 155. The motion to compel requested production of the Torrential Downpour software itself; the software's source code; and error logs for the software, which Defendant contended were necessary to show that the software was used to trace and tag his electronic devices similar to a GPS tracking device and, thus, amounted to a search that required a search warrant. Defendant argued in his motion to compel that the software and source code were "material to [his] Fourth Amendment litigation" and contention that the Government conducted an unlawful warrantless search of his computer. *Id.* at 4. All of these discovery motions were referred to the magistrate judge for hearing, if necessary, and determination. Doc. 162.

Although not included in his motion to compel, Defendant's attorney explained during the hearing on the discovery motions that he also wanted the source code to determine how the Torrential Downpour software worked (Doc. 180 at 13-14) and whether "the Torrential Downpour reports show that . . . there are other users" other than Defendant Kasnetz who "may have been accessing these same things through the IP address." Doc. 180 at 28. Defendant sought a last-minute continuance (Doc. 175) of the hearing on his discovery motions because his retained expert, Michele Bush with Loehrs Forensics, had a conflict and was unable to attend and assist the defense during the hearing on the date scheduled. The requested continuance was denied by the magistrate judge, but Ms. Bush attended and was allowed to participate in the hearing by video.

Both parties were allowed to put on evidence during the hearing on the discovery motions. Instead of calling his expert Ms. Bush, Defendant used the hearing as an opportunity to call and

---

[2] Rule 16(a)(1)(E) allows a defendant to inspect and obtain discovery in the form of documents and other materials from the Government if the document or object is "within the [G]overnment's possession, custody, or control and . . . . (i) the item is material to preparing a defense; [or] (ii) the [G]overnment intends to use the item in its case-in-chief[.]"

question the Government's witness, Pennsylvania Detective Robert Erdley, about an affidavit he had submitted in support of the Government's response to Defendant's motion to suppress that dealt with the Torrential Downpour software. As in his affidavit, Detective Erdley testified that he was involved in the development of Torrential Downpour.

Defendant attempted to no avail to get Detective Erdley to agree that the software was not reliable because it commonly accessed nontargeted devices and IP addresses other than those that were the focus of an investigation. Detective Erdley acknowledged that there were flaws in the early stages of the software's development and design, but he explained that those issues were fixed in 2012, and the version of the software now used by law enforcement is different from that used in 2012.  When asked whether any independent validation of the software and source code had been done, Detective Erdley testified that throughout the ten years that the software has existed, it has been validated "thousands of times." Doc. 180 at 31.  He also disagreed that there was any hidden source code in the software that could be exploited or used to send data or malware. Detective Erdley stated unequivocally that the software "does exactly what we purport it to do," and that this was confirmed "in Ms. Bush's prior tests" of the software on four prior occasions in other criminal cases.

In addition, Detective Erdley flatly rejected and disagreed with defense counsel's suggestion that it would be useful for the defense to obtain and test the source code to determine how it works and how law enforcement's investigation was actually performed.  *Id.* at 38.  In this regard, Detective Erdley noted that Ms. Bush and her mother Tami Loehrs both previously testified (in another criminal case) that they did not need the source code to test the software. Although this testimony was provided in another case, Detective Erdley expressed the opinion that he did not understand why they might believe differently in this case and declined to opine on the testimony

Ms. Bush might give in the present hearing if called to testify.  He also disagreed that there was any reason to believe that this case should be handled differently because Ms. Bush could "test the software without [the source code], which they did extensively already in [another prior] case [in which] a distribution count was [charged.]"[3]  *Id.*

Defendant presented no other additional evidence or testimony during the hearing.  The magistrate judge orally denied all of the discovery motions and followed up with an electronic order that similarly denied the motions for the reasons stated during the hearing. Doc. 179.  With respect to the motion to compel, the magistrate judge explained that Defendant had failed to establish that the information sought was material to his defense, that the arguments and evidence made by Defendant in support of the motion to compel were conclusory and simply repeated prior arguments made by him in his motion to suppress, which had already been denied by the undersigned. The magistrate judge, therefore, concluded that there was no legal basis for requiring the Government to produce the software, source code, or any other related materials sought in the motion to compel. The magistrate judge's rulings as these motions were not subsequently objected to by Defendant Kasnetz.[4]

---

[3] In responding to Defendant's motion to suppress evidence based on his software arguments (Doc. 149), the Government summarized Ms. Bush's previous testing of Torrential Downpour, which resulted in "no obvious failures."  Doc. 149 at 8-9 (quoting *United States v. Gonzalez*, No. 17-CR-01311, 2020 WL 5210821, at *6 (D. Ariz. Sept. 1, 2020).

[4] Defendant, nevertheless, asserts for the first time in his response to UMASS's Motion to Quash that he "sought discovery of the source code for the Torrential Downpour program"; that his motion to compel this information was denied by the magistrate judge; and in denying his motion to compel this information, the magistrate judge "never submitted findings of fact or conclusions of law to this Court." Def.'s Resp. 20 & n.2 (Doc. 242). Defendant's response further asserts that his "[c]ounsel has a transcript from a hearing [in which the magistrate judge] orally denied the motion and that this Court's memorandum opinion from March 22, 2022, disposed of the request."  *Id.* at n.2. The import and meaning of this assertion are unclear. As indicated, Defendant's discovery motions were referred to the magistrate judge for a hearing, if necessary, and determination—not for findings and conclusions—because of the nondispositive nature of the motions, which the magistrate judge had authority to decide without issuing a report containing her findings and conclusions. Further, in failing to timely object to any of the magistrate judge's rulings on his discovery motions, he waived any argument he might have now to those rulings.

### G.    Rule 17 Subpoenas to Obtain Software, Source Code, and Related Information

During the course of this case, three different attorneys for Defendant Kasnetz served subpoenas, pursuant to Federal Rule of Criminal Procedure 17(c), on various non-parties in an attempt to obtain information similar to the discovery sought via his motion to compel under Rule 16(a)(1)(E).

### 1.    May 2021 Subpoenas

Shortly before moving to withdraw as Defendant's counsel on June 2, 2021, Mr. Nash issued a subpoena to the City of Dallas ("the City") on May 10, 2021, that required the City to produce certain materials by May 30, 2021. Doc. 123. The subpoena was directed to the Dallas Police Department's Custodian of Records and sought production of 45 broad categories of documents and information including child pornography, records alleged to contain law enforcement privileged information and attorney-client privileged communications, alleged work product privileged information, licensed software, and physical computer hardware. This subpoena also sought all computer programs used to obtain the search warrant in this case, including Torrential Downpour, all information relating to Torrential Downpour used by investigators, and the source code for examination and testing by Defendant's expert.

The City moved to quash the subpoena on May 28, 2021, arguing that the subpoena was unreasonable and oppressive for various reasons, and sought discovery not obtainable under Rule 17(c). This and two other motions to quash that were filed by Paul Saputa, another former attorney of Defendant Kasnetz, and Taly Haffar, a former Assistant United States Attorney, were granted on June 25, 2021. Doc. 123.[5] In granting the motions to quash, the court reasoned that the timing

---

[5] After Mr. Haffar left the Government, he started a criminal defense practice. In its order granting the motions to quash, the court mistakenly referred to him as one of Defendant's former attorneys.

of the subpoenas was unreasonable given the large amount of materials sought to be produced in the short time provided.  The court further reasoned that, given Mr. Nash's withdrawal from the case, Defendant Kasnetz and any newly retained counsel might pursue a different legal strategy in not pursuing the materials in these subpoenas or attempting to obtain the materials through different means.

### 2.    October 2022 Subpoena

On October 26, 2022, the Government moved to quash two subpoenas served by Defendant Kasnetz's current attorney Mr. Palmer, contending that Defendant was using Rule 17 as an improper means of obtaining discovery, that is, to the extent that the subpoenas sought information not previously produced by it to Defendant.  The Government further contended that Defendant should be required to obtain court approval before issuing any additional subpoenas under Rule 17. Only one of these subpoenas is relevant to the court's current analysis.  The relevant subpoena was served on October 25, 2022, to Dr. Brian Levine, the University of Massachusetts computer science professor who assisted in developing Torrential Downpour.

This subpoena directed Dr. Levine to produce "any and all Data/Documents" and other information for 37 topics by October 31, 2022, including virtually every record related to the development and operation of every version of Torrential Downpour from its inception through present day, including the source code.  The court questioned whether the Government had standing to quash the subpoena on behalf of Dr. Levine but, nevertheless, determined that it had authority under Rule 16(d)(1), for good cause, to deny or restrict discovery, or grant other relief since the subpoena clearly sought discovery.  Doc. 217.  Consequently, on October 27, 2022, the court granted the Government's motion and quashed the subpoena, as the scope of the documents and information requested was unreasonably broad, and the subpoena notice and document

production deadline were unreasonably short (three business days after service of the subpoena). The court reasoned that compliance with the subpoena would, therefore, be unreasonable and oppressive under the circumstances.

### 3.   November 2022 Subpoenas

Approximately one month after the court quashed the subpoena served on Dr. Levine, Mr. Palmer served three more subpoenas on the afternoon of Friday, November 18, 2022, the week before Thanksgiving, in another attempt to obtain similar information from the University of Massachusetts Amherst, by and through its College of Information and Computer Sciences, and faculty members Dr. Levine and Marc Liberatore.  These subpoenas were also made pursuant to Rule 17 and are the subject of UMASS's current Motion to Quash.  The subpoenas required UMASS to provide the requested documents and materials to Defendant's counsel by November 30, 2022, at 5 p.m.  UMASS, through its counsel, filed a Motion to Quash the three subpoenas on November 30, 2022.

Because of the timing and scope of the subpoenas, the court stayed UMASS's deadline to produce the materials sought in the subpoenas until the court ruled on the Motion to Quash.  The court expedited Defendant Kasnetz's response deadline, given his prior assertion that a continuance of the trial was necessary to address the Motion to Quash.[6]  Defendant filed his response to the Motion to Quash on December 6, 2022 (Doc. 242), after jury selection had commenced.  During a brief conference outside of the jury panel, Defendant contended that he had not received all required supplemental expert disclosures from the Government as required by the amendment to Rule 16 that went into effect on December 1, 2022. Defendant argued that a

---

[6] In denying two other recent motions filed by Mr. Palmer to continue the trial and withdraw as Defendant's counsel, the court disagreed that a continuance was warranted based on its determination that Defendant Kasnetz should not be rewarded with a further continuance and delay of the trial for the situation he had created.  Doc. 230.

continuance would be necessary to give his counsel time to review any supplemental expert information disclosed by the Government and to prepare an adequate rebuttal. Defendant also represented that he did not have any expert witnesses and had not designated any Rule 702 expert.

### H.   Defendant's New Rule 702 Expert Rohan Mishra

In support of his response to UMASS's Motion to Quash, Defendant attached the affidavit of Rohan Mishra, who states that he is a software development expert.[7] After jury selection was completed on December 7, 2022, and the impaneled jury was released for the day, the court held a hearing with the parties and their counsel to address certain outstanding issues, including issues regarding Rule 702 experts. During this hearing, Mr. Palmer disclosed for the first time his intent to call Mr. Mishra as an expert to rebut the Government's expert testimony regarding the validity, accuracy, and reliability of the Torrential Downpour software used in the investigation of Defendant Kasnetz. Except for the affidavit submitted by Mr. Mishra in support of Defendant's response to UMASS's Motion to Quash, this was the first time that the court or the Government was made aware of Mr. Mishra. While Defendant's response to the Motion to Quash referenced the affidavit of Mr. Mishra, but the response, affidavit, and none of Defendant's prior filings in this case disclose that he might seek to call Mr. Mishra as a Rule 702 expert or fact witness in the trial of this case.

The parties presented their respective arguments as to whether Mr. Mishra was timely disclosed under Rule 16 and whether he should be permitted to testify in the trial of this case and render an opinion as a Rule 702 witness regarding any of the information the defense sought from UMASS through the recent subpoenas. Mr. Palmer acknowledged that Mr. Mishra was only found

---

[7] Defendant also submitted a copy of the February 20, 2018 search warrant; the law enforcement affidavit used to obtain the search warrant; a copy of the items seized; photos of Defendant's residence; and a transcript of the March 29, 2022 hearing conducted by the magistrate judge on Defendant's discovery motions.

recently by the defense. Mr. Palmer conceded that the required expert disclosures under Rule 16 as to Mr. Mishra were never provided to the Government. Mr. Palmer argued, however, that Mr. Mishra's affidavit provided the Government with sufficient notice such that it would not be prejudiced if Defendant Kasnetz was allowed to call Mr. Mishra as a rebuttal witness.

The Government disagreed that Mr. Mishra's affidavit provided sufficient notice. Given the lateness of notice provided after commencement of the trial, it contended that it would suffer legal prejudice if Mr. Mishra were allowed to testify as a Rule 702 expert. The court informed the parties that it would resolve the issue regarding Mr. Mishra in connection with ruling on UMASS's Motion to Quash because, as Defendant acknowledged, the issues are intertwined.

## II.      Discussion

### A.      UMASS's Motion to Quash November 2022 Subpoenas

#### 1.      The Parties' Contentions

UMASS contends that the three subpoenas served by Defendant Kasnetz shortly before Thanksgiving on November 18, 2022, should be quashed because they do not satisfy any of the legal requirements for subpoenas under Rule 17(c), and production of the materials sought would be unreasonable and oppressive given the volume of materials sought, the timing of the subpoenas, and deadline to respond to the subpoenas. UMASS further contends that the materials sought are protected by the law enforcement privilege because Torrential Downpour is an essential law enforcement tool used to combat the proliferation of child pornography. UMASS argues that revealing the software source code would essentially place this tool in the hands of sophisticated computer literate offenders that would allow them to avoid future detection.

Defendant Kasnetz disagrees and responds that the subpoenas easily satisfy the three requirements for subpoenaed documents under Rule 17(c). Def.'s Resp. 13 (Doc. 242). Regarding

this issue, both parties rely on *United States v. Nixon*, 418 U.S. 683 (1974); and *United States v. Arditti*, 955 F.2d 331 (5th Cir. 1992).

In addition, Defendant contends that examination of software source code is routine in civil litigation, and, in any event, the law enforcement privilege does not apply. Defendant notes that UMASS acknowledges that the copyright for the software is held by UMASS and its faculty members. He contends that "[w]hile, arguably, UMASS (as a governmental entity) could assert the privilege," he was unable to find any authority that would allow an individual faculty member to assert the law enforcement privilege. Regardless, Defendant asserts the burden to establish this privilege is on the party asserting it, and UMASS's Motion to Quash does not satisfy that burden.

Alternatively, in the event that UMASS's Motion to Quash is granted, Defendant contends that the Government should not be allowed to use what amounts to secret software evidence because it would be a violation of his Sixth Amendment right to counsel. In this regard, he argues:

> that his attorney has a duty under the Sixth Amendment to investigate all possible defenses. One such defense is [whether] the Torrential Downpour program violated Defendant's Fifth Amendment right to due process. Specifically, counsel has a duty to investigate whether Torrential Downpour creates fictitious or misleading evidence that is later used to support a search warrant. Yet the [G]overnment refuses to permit counsel for Defendant (in this case and in hundreds of others) to investigate the source code for Torrential Downpour. Instead of engaging in the adversarial process the [G]overnment asks defendants to trust that a program written by the [G]overnment, for the [G]vernment, and never subjected to adversarial review works as alleged. Counsel for Defendant believes that the Sixth Amendment requires counsel to investigate whether Torrential Downpour violates [his] Fifth Amendment due-process rights and that he cannot ethically simply "trust the [G]overnment."

Def.'s Resp. 17-18.

### 2.    Rule 17(c) Legal Standard

In resolving the Motion to Quash, the court focuses primarily on the parties' contentions as to whether the three requirements to obtain documents and other objects through the use of a

Rule 17(c) subpoena, as this issue is dispositive of whether the subpoenas should be quashed. Federal Rule of Criminal Procedure 17(c) "governs the issuance of subpoenas duces tecum in federal criminal proceedings"[8] and provides:

> A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

Fed. R. Crim. P. 17(c)(1). Rule 17(c)(3) further provides that, "on motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive." Rule 17(c) is not intended to provide a means of obtaining discovery in criminal cases. *Nixon*, 418 U.S. at 698 (citing *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951)). Thus, while Rule 17(c) extends to materials that are not subject to discovery under Federal Rule of Criminal Procedure 16, it is not a discovery device or means of obtaining discovery beyond that provided for in Rule 16. *Nixon*, 418 U.S. at 700; *Arditti*, 955 F.2d at 345 (citing *Bowman Dairy Co.*, 341 U.S. at 220). A Rule 17(c) subpoena must be sought in "good faith" and not as a "fishing expedition." *Arditti*, 955 F.2d at 347.

As the parties both recognize, the party seeking access to materials under Rule 17(c) has the burden of establishing three requirements. These requirements are that the subpoenaed documents be: (1) "relevant"; (2) "admissible"; and (3) "requested with adequate specificity." *Arditti*, 955 F.2d at 345 (citing *Nixon*, 418 U.S. at 700). The "specificity and relevance elements require more than the title of a document and conjecture as to its contents." *Arditti*, 955 F.2d at 345.

---

[8] *Nixon*, 418 U.S. at 697-98 (citations omitted).

**Memorandum Opinion and Order – Page 15**

### 3.     Analysis

Despite Defendant Kasnetz's contention to the contrary, the following argument in his Response to the Motion to Quash demonstrates that, like *Arditti*, the three subpoenas served on UMASS are being used for the impermissible purpose of obtaining discovery under Rule 17(c) and embarking on a fishing expedition to see what he can discover or ascertain:

12. Assuming the [c]ourt finds that the "law enforcement privilege" does not apply as UMASS hopes, Defendant must overcome the three steps to defeat the motion to quash. Generally, to overcome a motion to quash, the party seeking access to materials under a Rule 17(c) subpoena bears the burden of showing the subpoenaed document: (1) is relevant; (2) is admissible; and (3) has been requested with adequate specificity. *United States v. Arditti*, 955 F.2d 331, 345 (5th Cir. 1992); *see also* Fed. R. Crim. P. 17(c). Here the analysis is uncomplicated.

13. The source code is relevant because Torrential Downpour has been utilized to generate evidence that the [G]overnment will seek to introduce as *substantive evidence* of Defendant's guilt. *See* Ex. 4, *Affidavit of Rohan Mishra* pp. 2-3. In the absence of access to the source code, counsel is wholly deprived of the means to effectively challenge the testimony of the [G]overnment's expert/fact witnesses who will testify as to the reliability of data—and the conclusions drawn from it—as evidence of Defendant's downloading of child pornography and the deletion of child pornography.

14. Additionally, Torrential Downpour is the only basis for probable cause. Without probable cause, a search warrant would not have been issued, and no objectionable material would have been found. UMASS contends that the source code is not relevant because it is not the focus of the [G]overnment's case. But it is undisputed that the source code (in the form of the operating program) is the exclusive basis for probable cause and without it, there would not have been any search warrant. So while the program may not be part of the [G]overnment's case[,] the source code is very much part of the defense to the [G]overnment's case.

15. Counsel contends that the source code for Torrential Downpour is imperative to his ability **to assess whether** the [G]overnment had probable cause and/or violated Defendant's due-process rights by creating false or misleading evidence. Specifically, counsel contends that the affidavit for the search warrant establishes that[,] absent Torrential Downpour and its output[,] . . . there would have been no probable cause to search Defendant's computer. Counsel must have his expert **evaluate the source code to determine whether** to attack Torrential Downpour as the exclusive source of probable cause. If granted temporary access to the source code, Counsel would have the code examined **to determine whether** the program violated Defendant's due-process rights by creating false or misleading evidence. **Currently, Defendant's knowledge of the source code is so limited that his attorneys do not know what coding language the program is in.** Defendant's experts will look at the source code included in Exhibit Four.

**Memorandum Opinion and Order – Page 16**

16. Plainly, the source code is imperative to counsel's ability *to determine whether* by creating false or misleading information, the Torrential Downpour program violated Defendant's due-process rights. Importantly, counsel for Defendant does not seek access to the ICAC database of hash values that have been compiled. Instead, counsel for Defendant seeks temporary access to the source code for Torrential Downpour version 1.39 so that his attorney can have an expert *evaluate the program's ability to establish probable cause*.

17. The source code itself is probably not comprehensible to counsel or to the [c]ourt. Thus[,] the source code is admissible in the form of an expert opinion. In other words, *an expert could evaluate the source code, conclude whether* it produced false or misleading evidence[,] and then issue an affidavit that would be admissible in a motion to suppress. There should be no dispute that a properly disclosed expert could provide testimony. *See* FED. R. EVID. 702. Even if the expert does not testify, the expert could be a consulting expert to prepare counsel to argue to this [c]ourt the manifest need for a continuance and to prepare to cross-examine [G]overnment witnesses.

18. Finally, the request has been made with legitimate specificity. Specificity serves to prevent a subpoena from being converted into a license for a "fishing expedition" to see what may turn up. *United States v. Nixon*, 418 U.S. 683, 700, 94 S. Ct. 3090, 3103, 41 L. Ed. 2d 1039 (1974). In this case there are only four requests. They are limited to the period between October 6, 2017, and February 20, 2018. Yet, in its argument that the request is too broad, UMASS omits the fact that the request is only for version 1.39 of Torrential Downpour and only for materials from between October 6, 2017 and February 20, 2018. (ECF 228, page 9).

19. UMASS has argued that the scope is broad, but what Defendant seeks is:

> k. Source code from the period between October 6, 2017[,] and February 20, 2018;

> l. The security procedures from October 6, 2017[,] to February 20, 2018;

> m. The testing of the program between October 6, 2017[,] and February 20, 2018; and

> n. User manuals from the period between October 6, 2017[,] and February 20, 2018.

20. Arguably these requests could be narrowed, but *to test the veracity of the program*, these are the tools that counsel's expert requires. Further, these are limited to version 1.39. Counsel has not engaged in "fishing expedition" to see what he can discover. Instead[,] this is a narrow request for one (presumably outdated) version of Torrential Downpour so that it can be tested *to determine whether* it produced false or misleading results. This is hardly the "extraordinarily vague and over broad . . . " request that UMASS contends.

. . . .

49. Here the source code is sought . . . *to determine whether* the program functions as proclaimed, *to learn whether* the program is prone to "false positives" or other result-based errors, etc.

Def.'s Resp. ¶¶ 12-20, 49 (emphasis added).

While the scope of the materials requested in Defendant's current subpoenas is narrower than the scope of the materials in his prior October 2022 subpoena to Dr. Levine, it is certainly not as narrow as Defendant suggests and does not satisfy Rule 17(c)'s specificity requirement. As shown below, instead of identifying specific documents to be produced or describing with specificity the contents of the documents to be produced, Attachment A to each of the three current subpoenas includes broad categories of documents to be produced:

### DOCUMENTS TO BE PRODUCED

Please provide the following: for **Torrential Downpour Version 1.39:**

1. The source code, to include *all* programmer comments *and complete revision history* of the application known as *Torrential Downpour and* associated software *and* systems as was implemented *and* in effect between October 6, 2017, to February 20, 2018.

2. Please provide *all* documents relating to *all* security frameworks or programs in place to protect *all* information related to *Torrential Downpour and* associated systems *and* software. *Including* but not limited to any physical, administrative, or technical safeguards, policy, and procedure documents in effect between October 6, 2017, to February 20, 2018.

3. Please provide *all* documents that reflect testing of *Torrential Downpour* in accordance with National Institute of Standards and Technology Computer Forensics Tool Testing Program *including* published test results in effect between October 6, 2017, to February 20, 2018.

4. Please produce *all* unredacted user manuals for *Torrential Downpour* version 1.39 *including any* applicable frequently asked questions to law enforcement officers or agents utilizing *Torrential Downpour* in effect between October 6, 2017, to February 20, 2018.

UMASS's Mot. Quash (Doc. 228-1 at PageIDs 3192, 3199, 3206) (emphasis added).

Moreover, the extensive use of "all" and "and" in these four categories broadens the scope of documents sought far beyond the "source code," "security procedures," "testing of the program," and "user manual" that Defendant asserts must be produced.  Def.'s Resp. ¶ 19. Additionally, contrary to Defendant's assertion, these categories, as written, are not limited to the time frame referenced or to version 1.39 of Torrential Downpour because the definitions included in the subpoenas state that the term "[i]ncluding" means "including but not limited to" and defines Torrential Downpour" or "Torrential Downpour Receptor" as meaning "*all versions* of Torrential Downpour" software "*and all other software(s)* included in the Torrential Downpour investigative software suite." UMASS's Mot. Quash (Doc. 228-1 at PageIDs 3194-95, 3201-02).  In addition, "any" is defined as meaning "'all,' 'each and every,' or 'anyone,' whichever makes the request more inclusive."  *Id.* at PageIDs 3194, 3201.

Like the defendant in *Arditti*, who sought "*[t]o ascertain*" the Government's "purpose, method, and means of targeting and then pursuing" him to support his entrapment and due process defenses, Defendant Kasnetz asserts in his response to the Motion to Quash that the materials and information demanded in the three subpoenas to UMASS, including the source code, is sought to:

- 15. . . . *to assess whether* the [G]overnment had probable cause and . . . violated [his] due-process rights by creating false or misleading evidence. . . .[; to] have his expert *evaluate the source code to determine whether* to attack Torrential Downpour as the exclusive source of probable cause [and] *determine whether* the program violated [his] due-process rights by creating a false or misleading evidence[;]

- 16. . . . *to determine whether*[,] by creating false or misleading information, the Torrential Downpour program violated [his] due-process rights. . . . Defendant seeks temporary access to the source code for Torrential Downpour version 1.39 so . . . an expert [can] *evaluate the program's ability to establish probable cause*[;]

- 17. . . . [to] *conclude whether* [the software program] produced false or misleading evidence[; and]

- 20. . . . *to determine whether* it produced false or misleading results[; and]

  . . . .

- 49. . . . *to determine whether* the program functions as proclaimed, *to learn whether* the program is prone to "false positives" or other result-based errors, etc.

Def.'s Resp. ¶¶ 15, 16, 17, 20, 49 (emphasis added).  Defendant's response goes on to explain that: (1) "[i]n other words, *an expert could evaluate the source code, conclude whether* it produced false or misleading evidence[,] and then issue an affidavit that would be admissible in a motion to suppress; and (2) "[a]rguably these requests could be narrowed, but *to test the veracity of the program*, *these are the tools that counsel's expert requires*.  *Id.* ¶¶ 17, 20 (emphasis added).

As in *Arditti*, this amounts to a classic fishing expedition to ascertain or determine what is currently unknown to the defense about the Torrential Downpour software in the hope that whatever is uncovered will support Defendant Kasnetz's defensive theory that probable cause for the search warrant *would be lacking if could be shown* that the software was prone to making mistakes in identifying and targeting specific IP addresses involved in the sharing and downloading of child pornography.  Because Defendant Kasnetz acknowledges that he not only seeks the materials in the subpoenas, but also needs the materials subpoenaed, *to determine whether* probable cause existed for the warrant to search his residence and computers, he fails to establish with sufficient specificity the evidentiary nature of the requested materials for purposes of Rule 17(c).  *Arditti*, 955 F.2d at 346.  As explained in *Arditti*, this is sufficient to demonstrate "why he wants to look into the material, but he has not set forth what the subpoena's materials contain, forcing the court to speculate as to the specific nature of their contents and its relevance," if any.  *Id.*

Defendant also asserts that its new "consulting expert has found inconsistencies in the Torrential Downpour logs" produced by the Government, and that these inconsistencies "indicate[] the potential that there are errors in the TDR source code that effect the reliability and accuracy of TDR to perform as claimed."[9] For support he cites the affidavit of his new expert Mr. Mishra. This assertion, however, mischaracterizes Mr. Mishra's affidavit, which does not even mention the Torrential Downpour software or logs at issue in this case and, instead, only speaks in vague generalities regarding "TDR," the term he uses to describe "a software program" or any software program.

In this regard, Mr. Mishra starts by stating that his affidavit is:

> intended to demonstrate that **TDR (a software program)**, without substantial peer-reviewed testing, is prone to errors which may be serious enough to falsely implicate otherwise innocent people. In the absence of peer-review and extensive testing, a source-code review as known as whitebox testing is the next best alternative.

Def.'s Ex. 4 at 1.  Aside from being far too general in nature, the premise for his affidavit—the need for source code review in this case—is flawed, as he does not state anywhere in the affidavit that the Torrential Downpour software used in this case is prone to errors *because it lacks or is "without substantial peer-reviewed testing." Id.* (emphasis added).  Defendant Kasnetz's reliance on the affidavit to obtain the source code for the Torrential Downpour software used in this case is, therefore, misplaced.

Mr. Mishra goes on to state that the "creation of the logs by TDR is not a transparent process," and that "source code review would reveal the mechanism by which . . . logs are generated." Def.'s Ex. 4 at 4-5.  He also appears to state that errors can occur in generating logs if done under the assumption that only one IP [address] is used for the download because the

---

[9] Def.'s Resp. ¶ 44 (citing Ex. 4 at 2, R. Mishra Aff.).

**Memorandum Opinion and Order – Page 21**

[software] programmer coded it[] while not logging any accidental download of files from other IPs." These statements are unhelpful for the reasons already explained. In addition, the statements are too general, hypothetical, and not tied to Defendant's contention that Mr. Mishra reviewed the Torrential Downpour logs in this case and found inconsistencies. Thus, his affidavit does not assist Defendant Kasnetz in satisfying his burden to establish with specificity the documents or materials sought under Rule 17(c).

Moreover, the response to UMASS's Motion to Quash confirms the undersigned's suspicion that Defendant Kasnetz is attempting to obtain the information sought under Rule 17(c) for an impermissible purpose—to file another motion to suppress and/or attack and undermine the court's rulings on his prior motions to suppress the evidence seized from his residence and computers pursuant to the search warrant obtained by law enforcement based on its use of the Torrential Downpour software and related investigation. **The court made unequivocally clear to Defendant in open court on December 7, 2022, after the trial started, that it was not willing to revisit or allow Defendant to relitigate the suppression rulings in this case or the issue of whether there was probable cause for the search that gave rise to the charges in this case.** The arguments that Defendant Kasnetz hopes to assert through his current counsel based on information in the form of Torrential Downpour source code and related materials that he has yet to obtain may not be identical to the suppression arguments his former counsel made in the past. The motion deadline, however, expired long before Mr. Palmer and Defendant's current defense team came on board, and Defendant's new counsel was well aware that the court was unwilling to continue the motion deadline or any deadline again because doing so would delay the December 6, 2022 trial setting.

The court understands and appreciates that Defendant's current defense team is attempting to provide Mr. Kasnetz with an adequate defense and the best representation possible notwithstanding that Mr. Palmer was only retained less than three months before the trial was scheduled to commence in a case that has been pending more than four years.[10]  Even so, Defendant Kasnetz's decision to retain new counsel late in the case is not a valid basis for continually attempting to retain new counsel for the purpose of asserting new suppression arguments or relitigating suppression issues that were resolved several months ago in March 2022. The time for motion practice and suppression arguments in any form has long since passed, and it is time to move forward with the trial of this case.

For all of these reasons, UMASS's Motion to Quash is **granted**, and the request made by Defendant for the first time in his response to the Motion to Quash to prohibit the Government from presenting any evidence based on Torrential Downpour is **denied.**

### B.    Defendant's Oral Motion to Allow an Undisclosed Rule 702 Expert Testify as a Rebuttal Witness in the Trial of This Case

As indicated, on December 7, 2022, one day after the trial of this action commenced, Defendant's counsel Mr. Palmer announced in open court that Defendant intended to call Mr. Mishra as a Rule 702 witness, even though he had not been previously designated or disclosed to the Government.  Mr. Palmer acknowledged that he had told the court the day before that Defendant had no Rule 702 expert but explained that there was a miscommunication between him and Mr. Kasnetz, who wanted his defense team to call Mr. Mishra as a witness in his trial.  Mr. Palmer stated that Mr. Mishra was originally intended to only be a consulting expert. He contradicted himself, however, by also stating that it was the defense's strategy all along to call Mr. Mishra as a Rule 702 expert witness to rebut any testimony Detective Erdley provided in the

---

[10] Defendant's other three current attorneys were retained and brought on only days before the trial.

Government's case-in-chief.  Mr. Palmer asserted that it was now necessary to call Mr. Mishra because the Government had advised that it was no longer intending to call Detective Erdley in its case-in-chief.  The court, however, pointed out that there would be nothing for Mr. Mishra to rebut if the Government was not going to call Detective Erdley.  Mr. Palmer also tried to explain the discrepancy between what he had told the court the day before and what he was now saying about the defense's intention to call Mr. Mishra as an expert.  In this regard, Mr. Palmer stated that nothing was mentioned the day before because he did not believe that Mr. Mishra would be able to travel from Toronto, Canada, to attend the trial.  In sum, Defendant's explanations for the eleventh-hour notice regarding Mr. Mishra were "all over the place" and, frankly, made no sense.

Regarding a defendant's expert disclosure obligations, Federal Rule of Criminal Procedure 16(b)(1)(C) requires the defendant, at the Government's request, to provide the Government "a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial, if . . . the defendant requests disclosure under subdivision (a)(1)(G) and the [G]overnment complies[.]"

Here, Defendant Kasnetz expressly conceded a number of times in response to the Motion to Quash and when this issue was discussed in open court on December 7, 2022, that he had not made the required expert disclosures for Mr. Mishra under Rule 16.  The first mention of Mr. Mishra was included in Defendant's response to UMASS's Motion to Quash.  There was no indication in this response or any other filing, however, that Defendant intended to call Mr. Mishra as a Rule 702 witness, or any type of witness for that matter.

Defendant's only excuse for the failure to timely disclose Mr. Mishra as required by Rule 16(b)(1)(C) is because his current counsel came on board late in the case, and his former counsel did not designate any attorneys or make any required expert disclosures, although there was some

discussion previously about Defendant retaining Ms. Bush as a Rule 702 expert.  As the court explained, though, this situation is entirely one of Mr. Kasnetz's own making and attributable to his inability to get along with any of his attorneys, which has resulted in a revolving door of defense attorneys and contributed to the delays in this case.

The court further determines that the Government will be legally prejudiced if Mr. Mishra is allowed to testify as a Rule 702 witness, given the late timing of Defendant's notice after the trial started and the inadequacy of Mr. Mishra's affidavit to provide the Government with the disclosures required under Rule 16(b)(1)(C) with respect to a written summary of any testimony he intends to provide at trial under Rules 702, 703, or 705.  As this was something within the defense's control, it would be unfair to the Government, at this late juncture, to require the Government to try this case while at the same time attempting to prepare a prosecution witness to respond to an opinion that Mr. Mishra might testify to at trial.[11]  This is particularly so because it is readily apparent from Defendant's response to UMASS's Motion to Quash, Mr. Mishra's affidavit, and the discussion of this issue during the hearing on December 7, 2022, that Mr. Mishra has not yet reached any opinion and cannot do so unless and until he is allowed to review the Torrential Downpour source code.  Likewise, Mr. Mishra is not aware of and cannot provide any of the factual bases that might he rely on to support an expert opinion, and any testimony by him in this regard would be based on pure speculation.  Thus, even if the court had denied UMASS's Motion to Quash, the prejudice to the Government in allowing Mr. Mishra to testify as a Rule 702

---

[11] Additionally, before the issue of Mr. Mishra was raised, the defense knew that the Government's first witness Detective Jeff Rich, the witness who would most likely be used by the Government to rebut any testimony by Mr. Mishra, would not be available for this purpose by the time Defendant presumably put on his case because Detective Rich was attending a conference that had been scheduled for months in advance.  It was for this reason that Detective Rich was allowed to testify on December 8, 2022, before leaving for the conference, and proceeding in this manner was agreed to by both sides. The Government argued, and the court agrees, that the Government would be prejudiced given Detective Rich's unavailability to respond to any last minute, undisclosed expert testimony by Mr. Mishra.

witness under these circumstances would be too great, not to mention the harm that would result from additional delays.

The late timing and inadequacy of the available information regarding Mr. Mishra and any opinion he might provide in the trial of this case would similarly interfere with the court's ability to perform its gatekeeping function to ensure that "any and all scientific evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

"*Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge" that is non-scientific in nature. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).[12] In its gatekeeping role, the court determines the admissibility of expert testimony based on Rule 702 and *Daubert* and its progeny.[13] Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides that:

---

[12] In *Kumho Tire*, the Supreme Court resolved a split among the circuits and held that Daubert's "gatekeeping" function applied to all expert opinion testimony based on specialized knowledge, not merely scientific expert testimony. Before *Kumho Tire*, the Fifth Circuit had held that *Daubert* applies to expert testimony based on engineering principles and practical experience. *See Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir. 1997).

[13] The amendments to Federal Rule of Evidence 702, effective December 1, 2000, essentially codify *Daubert* and *Kumho Tire*. The Advisory Committee's note to Rule 702 states that the determination of whether an expert's opinions are reliable if based upon sufficient facts or data calls for a "quantitative rather than qualitative analysis." In addressing this issue, the "question is whether the expert considered enough information to make the proffered opinion reliable. . . . The expert must base [his or her] opinion on at least the amount of data that a reliable methodology demands." 29 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 6268 (2d ed. 1987). Further, in reviewing

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

*Id.*

Contrary to Defendant's assertion, the affidavit submitted by Mr. Mishra in support of Defendant's Response to UMASS's Motion to Quash does not satisfy any of the requirements for the admissibility of expert testimony under Rule 702. He has expressed no opinion regarding the software used in this case and admittedly lacks sufficient facts and data to form such an opinion. It is not clear what principles or methods would be applied to arrive at any opinion or testimony, and, thus, it cannot be said that he has reliably applied any principles or methods to the facts of this case.

Even the summary of Mr. Mishra's experience that is included in his affidavit is insufficient to demonstrate that he is qualified to testify regarding the investigative software used in this case. While he states in conclusory fashion that he is a "software development expert," and "[t]he testament to [his] expertise is that [he] founded and ran a successful small business in software development since 2016," it is unclear why his experience in "general software development process" of unidentified types of software and reviewing software logs generated by various programs would qualify him to testify as a Rule 702 expert regarding the Torrential Downpour

---

a *Daubert* challenge, the court makes no credibility determinations; it only decides whether the threshold reliability standards have been satisfied. *See* Fed. R. Evid. 702 advisory committee's notes (2000 amendments).

software. Def.'s Ex. 4 at 1. Further, as previously explained, the stated purpose of Mr. Mishra's affidavit—to demonstrate the general proposition "that TDR (a software program)," as opposed to the specific software used in this case, may be prone to errors if it has not undergone "substantial peer-reviewed testing"—is not relevant to this case.

In other words, the court, the Government, and even the defense, have no idea what testimony and opinions Mr. Mishra will provide if he is allowed to testify at trial; whether such testimony would be relevant and reliable; whether he is qualified to provide such testimony; or whether any such testimony would assist the jury, as opposed to confusing and misleading them. The court, therefore, expressed its concern that, if Mr. Mishra were allowed to testify, it would have to address and rule on these matters in the presence of the jury without a roadmap to guide it or tell it what is going to take place. Further, at this late juncture, without knowledge of what opinions Mr. Mishra would express, the Government cannot adequately rebut his opinions and would, therefore, be unduly prejudiced at trial.

Additionally, a *further* continuance of the trial at this juncture is untenable given the time already invested by counsel, the court, and jurors, and Defendant's inadequate justification for the untimely and yet-to-be made expert disclosures required by Rules16 and 702, and the orders entered in this case. Knowing that holidays are drawing near, the court specifically told potential jurors during jury selection that the trial would be finished by December 16, 2022, or no later than December 20, 2022. Because of the court's criminal docket and the availability of witnesses, potential jurors were also advised that there would be no trial proceedings on Mondays. This information was relied on by the court, parties, and jurors to enable them to disclose unavoidable conflicts. The court and Government have been ready to try this case for quite some time,[14] and

---

[14] When this action was reassigned on November 30, 2020, more than two years ago, the undersigned was advised that all that remained was the trial of the case!

Defendant was repeatedly told that there would be no additional continuances, yet here we are again.

Moreover, Defendant waited until after a jury was selected and impaneled before notifying the court and the Government for the first time of his intent to call Mr. Mishra as a Rule 702 expert witness. Allowing him to testify would either require: (1) the court and all parties involved to "wing it" during the trial; or (2) another continuance of the trial to allow Defendant to make the required disclosures to the Government (after Mr. Mishra reviews the software source code) and give the Government adequate time to prepare a witness to respond to the last-minute expert testimony. Neither option is acceptable in light of the four years that Defendant has had to prepare a defense to the charges in this case.

To make matters worse, Defendant's lead attorney notified the court's staff for the first time at approximately 9 p.m. on December 8, 2022, that he has a conflict due to a prepaid family vacation and, as a result, he will be unavailable to participate in the trial of this case on Friday, December 16, 2022. Counsel knew when he agreed to represent Mr. Kasnetz that the trial was scheduled to start on December 6, 2022, and would not be continued again. Counsel was reminded of this fact again when the court denied another continuance requested by him that was made on the eve of trial. Thus, the trial will move forward as scheduled.[15] Defendant is currently represented by three or four retained attorneys, which is sufficient to proceed with the trial. Every time the trial of a case is delayed, the likelihood increases that witnesses will become unavailable for various reasons and memories will fade.

Accordingly, the court **denies** Defendant's oral motion to allow Mr. Mishra to testify in the trial of this case for purposes of providing previously undisclosed expert testimony under Rule

---

[15] Currently, there is no motion to continue by Mr. Palmer before the court.

**Memorandum Opinion and Order – Page 29**

702 or in any other capacity.  This same ruling and much of the same reasoning applies to any other undisclosed defense witness.  Thus, no witnesses who were not timely disclosed under the Federal Rules of Criminal Procedure or the court's scheduling order will be permitted to testify in the trial of this case.

## III.    Conclusion

For all of the reasons stated, the court **grants** UMASS's Motion to Quash the three subpoenas issued to the University of Massachusetts Amherst, by and through its College of Information and Computer Sciences, and faculty members Brian Levine and Marc Liberatore. Accordingly, the three subpoenas served on UMASS are hereby **quashed.**  Further, the court **denies** Defendant's oral request, made for the first time on December 7, 2022, to call Rohan Mishra as a Rule 702 expert witness, and Mr. Mishra will not be allowed to testify with respect to any matter, whether in the capacity of an expert opinion or fact witness, in the trial of this case.  The court also **denies** the request made by Defendant for the first time in his response to the Motion to Quash to prohibit the Government from presenting any evidence at trial based on Torrential Downpour.  The court **directs** the clerk to file this order **under seal**.

It is so ordered this 11th day of December, 2022.

Sam A. Lindsay
United States District Judge